**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

I, Aaron F. Bartholomew, being duly sworn, depose and state the following:

## I.   Introduction

1. I make this continuation as part of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – a cellular telephone, as described in Attachment A – that is currently in the possession of law enforcement, and the extraction of electronically stored information from that property as described in Attachment B.

2. I am a Special Agent with Federal Bureau of Investigation (FBI), Grand Rapids Resident Agency, further assigned to the Grand Rapids Police Department Major Case Team. I have been employed by the FBI as a Special Agent for more than 10 years. As a FBI Special Agent, I am primarily responsible for investigating violations of federal law, to include weapons violations and violations related to the importation and distribution of controlled substances. During my tenure with the FBI, I have been specifically involved in numerous weapons offense and controlled substance-related investigations resulting in arrests and convictions of individuals for violations of 18 U.S.C. § 922(g), 18 U.S.C. § 924(c), and 21 U.S.C. §§ 841 and 846.

3. In order to become a Special Agent, I attended the FBI Academy in Quantico, Virginia, where I received basic training for criminal casework, including conducting narcotics and firearms investigations. I have also attended additional advanced training for gang investigations, narcotic investigations, and cell phone analysis. During my time as a Special Agent, I have worked dozens of narcotics and

weapons cases with multiple local drug teams as well as the Drug Enforcement Administration (DEA). I have also worked on two different FBI Safe Streets Task Forces, both of which focused on the investigation of violent crime and gang activity. I have worked numerous gang cases, which often involved the sale of narcotics and possession of weapons. I also have experience using Confidential Informants to conduct controlled drug purchases from targets of my investigations.

4. Through my training and experience, I have become familiar with the manner in which illegal drugs are distributed and the methods of payment for such drugs. I also know from training and experience that, to protect against theft, drug traffickers frequently keep firearms and ammunition in close proximity to their drugs, currency, or other items of value. Because drug traffickers cannot report the theft of drugs, drug proceeds, or other items of value to law enforcement without substantial risk of their illicit activities being discovered, they must "protect themselves" and must "police" areas where drugs are bought, sold, and stored through the possession and use of firearms and other dangerous weapons.

5. I also know from my training and experience that individuals engaged in the sale of illegal drugs frequently use cellular telephones to facilitate their illegal activities, including but not limited to sending and receiving messages to and from their customers and discussing their illegal activities on social media sites including Facebook. Specifically, based upon my training, experience, and participation in drug investigations, I am aware of the following:

    a. Drug traffickers often keep names, aliases, and/or contact

    information of suppliers, purchasers, and others involved in drug trafficking in their devices;

b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

c. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

e. Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

f. User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

g. Drug traffickers often use the Internet to look up various information to support their drug trafficking activities on their devices; and

j. That drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery

service and frequently keep copies of tracking numbers, receipts and photographs of packaged narcotics on their devices.

6. I respectfully submit that there is probable cause to believe that GREGORY ROGERS, aka "Greedy," has engaged in the distribution of, and in the possession with intent to distribute, marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D) as well as illegal firearms possession, in violation of 18 U.S.C. §§ 922(g) and 924(c). I further submit that there is probable cause to believe that evidence of these offenses will be found on the cell phone described in Attachment A.

7. The information set forth in this affidavit is based upon my personal knowledge derived from my participation in this investigation and on information I believe to be reliable from the Grand Rapids Police Department (GRPD) and other federal, local, and state law enforcement agencies. Specifically, the statements set forth in this affidavit include information learned from, but not necessarily limited to, the following sources: (a) other law enforcement agencies; (b) subject interviews; (c) laboratory analysis reports; and (d) my training and experience in addition to the training and experience of other law enforcement agents. This statement is not intended to include each and every fact known by me or the government.

## II.  Identification of Device to Be Examined

8. The property to be searched is an Apple iPhone 6sPlus, silver in color, model number A1687, with a cracked screen, hereinafter the "Device." The Device is currently located at the Grand Rapids Police Department, 1 Monroe Center, Grand Rapids, MI 49503, and is currently stored in the Property Management Unit as Item #1

under incident number 20-025226.  The "home" screen of the phone appears to be a photograph of ROGERS lighting a marijuana cigarette (*see* Attachment A below).

9.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data, further described in Attachment B.

### III.    Probable Cause

10.     Since approximately October, 2018, I have been assigned to work investigations involving individuals violating drugs and weapons laws in the Grand Rapids, Michigan area.  As part of my duties, I have been involved in an investigation of ROGERS since early 2020.  Based upon my investigation to date, I am aware that ROGERS was convicted by the State of Michigan in both January and May 2017 of Carrying a Concealed Weapon.  ROGERS cannot legally possess a firearm due to his previous convictions.

11.     On January 27, 2020, officers with the GRPD responded to the address of 941 Sherman St. SE, Grand Rapids, MI, in the Western District of Michigan, on a report of an assault.  During their investigation into the assault, officers, in an attempt to locate the suspected assailant, made contact with ROGERS, who was sitting in the front passenger seat of a blue Chevy Cruze car, which was parked on the south side of the road across from 941 Sherman St. SE with the engine running.  There were no other occupants of the vehicle.

12.     When officers made contact with ROGERS, he initially gave them a false name before eventually identifying himself as GREG ROGERS.  ROGERS told

officers that he was not involved in the assault but had come to the area with his girlfriend, who was at her family's house nearby. ROGERS did not provide his girlfriend's name or her specific whereabouts.

13. After identifying ROGERS, an officer accessed a police database and conducted a check for outstanding warrants. The file check revealed a felony warrant for Carrying a Concealed Weapon. The officer accessed a picture of ROGERS and confirmed the subject in the vehicle was, in fact, ROGERS.

14. Upon learning that ROGERS had an outstanding warrant, officers asked ROGERS to get out of the car and subsequently arrested him. A search of ROGERS' person revealed the keys to the Chevy Cruze inside his left pocket. Officers also found $785.00 in US currency and a cell phone (not the Device that is the subject of this Continuation) on his person.

15. Officers conducted a search of the vehicle. An officer conducting the search noted the smell of marijuana being in the passenger compartment. Officers also observed loose marijuana on the floor of the vehicle where ROGERS had been sitting. Officers also found baggies in the center console and two digital scales in the pocket of the driver's side door.

16. Officers continued their search and located a gallon bag of fresh marijuana underneath the driver seat. As officers went to remove the bag, they discovered a black and silver handgun underneath the driver's seat in close proximity to the bag of marijuana. The firearm was strategically placed so that it was quickly and easily available for use.

17. On January 29, 2020, the forensic unit advised detectives they had located ROGERS' fingerprints on the bag of marijuana that officers initially recovered under the driver's seat in close proximity to a loaded handgun. On February 5, 2020, a Detective with the GRPD field tested the marijuana with positive results.

18. As part of the investigation, officers also executed a search warrant on ROGERS' cell phone. I have reviewed the forensic extraction reports created as part of the execution of the warrant. On the phone, there was clear indicia of drug sales and weapons possession. For example, on January 27, 2020 (the same day he was arrested) ROGERS received a message from telephone number (616) 389-7284 stating "What kind of weed you got rn?" Based upon my training and experience, I believe this message was asking ROGERS about what marijuana he had for sale. ROGERS' phone also contained messages that I understood to refer to the price of drugs that ROGERS had for sale and discussing where to meet to conduct said sales. The forensic report also revealed that ROGERS' phone contained numerous pictures of significant quantities of marijuana as well as photographs of ROGERS with various handguns.

19. The above events ultimately led to ROGERS being charged with three federal felonies – possession with the intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C § 924(c)(1)(A); and being a felon in possession of a firearm, in violation of 18 U.S.C. 922(g)(1). *See* Case No. 1:20-mj-00150. A warrant was subsequently issued for ROGERS' arrest.

20. On April 28, 2020, I along with other officers located ROGERS sitting in the driver's seat of the same blue Chevy Cruze that he was found in on January 27, 2020. The car was parked on the street in the vicinity of 740 Adams St. SE in Grand Rapids. There was no one else in the vehicle other than ROGERS.

21. After officers identified ROGERS, they instructed him to get out of the car so that he could be taken into custody. ROGERS then got out of the driver's side of the Chevy Cruze, leaving the driver's side door open.

22. From the street, officers then looked into the driver's side of the Chevy Cruze. Inside, officers saw, in plain view, a silver and black handgun on the driver's side floorboard, along with small bag of marijuana (approximately the size of a golf ball) next to the gun, and ROGERS' cell phone – the Device that is the subject of this Continuation. Officers could see that the Device was open to what they believed to be ROGERS' Facebook page.

23. Officers subsequently searched the vehicle. Inside the driver's side door, officers located a blue digital scale and a larger bag containing loose marijuana. In the center console, officers recovered three additional smaller baggies of marijuana, the tops of which were knotted. The total weight of the marijuana recovered was approximately 2.5 ounces – which I know from my training and experience to be a quantity consistent with drug distribution rather than personal use.

24. Finally, officers found empty plastic baggies in the seatback pocket of the Cruze's passenger seat as well as a cutting tray and scissors on the passenger seat. The cutting tray contained marijuana residue. I know from my training and

experience that individuals who are involved in selling marijuana will cut the marijuana on trays like the one recovered on the passenger seat of the Cruze and then package the marijuana individually for sale. I also know that the other items found in the vehicle – a scale, baggies, a cell phone, and a handgun – are indicia of an individual engaging in the distribution of illegal drugs.

## IV.   Electronic Storage and Forensic Analysis

25.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

    a.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

        i.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        ii.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is

analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  iii. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  iv. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  v. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

b. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the

entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

   c. *Manner of execution.*  Because this warrant seeks only permission to examine the Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V. Request for Authorization to Unlock Device with Fingerprints or Face Identification

  26. Based on my knowledge and experience, I know that certain cellular telephones, including Apple iPhones, may be locked and/or unlocked by personal identification numbers (PIN), gestures or motions, and/or with biometric features, such as thumb and fingerprint recognition (collectively, "fingerprint ID") and/or facial recognition ("facial ID").

  27. If a user enables the fingerprint ID unlock feature on a device, he or she can register several fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's sensor, which typically is found on the front of the device. In my training and experience, users of devices that offer fingerprint ID or facial ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device

are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

28.     In some circumstances, a fingerprint or face cannot be used to unlock a device, and a passcode or password must be used instead. Depending on the configuration of the security settings on the phone, the opportunity to unlock the device via fingerprint ID or facial ID exists only for a short time. Fingerprint ID and facial ID also may not unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) several unsuccessful attempts to unlock the device are made.

29.     The passcode or password that would unlock the device(s) found during the search is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) or present the face of the user(s) of the device(s) found during the search to the device's fingerprint ID or facial ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant device(s) via fingerprint ID or facial ID is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

30.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a device via the fingerprints on thumbs or index fingers.

31.     Based on the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of GREGORY ROGERS to the fingerprint ID

sensor or to present his face to the facial ID sensor of any his seized device(s) to attempt to unlock the device in order to search the contents as authorized by this warrant.

### VI.  Conclusion

32.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.